Melissa A. Fortunato (SBN 319767)
  fortunato@bespc.com
Marion C. Passmore (SBN 228474)
  passmore@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
515 S. Flower Street, Suite 1800
Los Angeles, California 90071
Telephone: (213) 612-7735
Facsimile: (212) 214-0506

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

|  |  |
|---|---|
| STEFANIE NELSON, derivatively on behalf of XPONENTIAL FITNESS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ANTHONY GEISLER, JAIR CLARKE, MARK GRABOWSKI, CHELSEA A. GRAYSON, JOHN MELOUN, and BRENDA MORRIS, <br><br> Defendants, <br><br> and <br><br> XPONENTIAL FITNESS, INC., <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **Jury Trial Demanded** |

## INTRODUCTION

Plaintiff Stefanie Nelson ("Plaintiff"), by and through her counsel, derivatively on behalf of Nominal Defendant Xponential Fitness, Inc. ("Xponential" or the "Company"), submits this Verified Stockholder Derivative Complaint against Defendants (defined below) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by Xponential with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Xponential; (iii) court submissions in securities class actions (now consolidated) under the caption *In re Xponential Fitness Securities Litigation*, Case No. 8:24-cv-00285-JWH-KESx, against the Company's Chief Financial Officer ("CFO"), former Chief Executive Officer ("CEO"), and others alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading, between July 23, 2021 and May 10, 2024 (the "Relevant Period") with respect to Xponential's business, operations, and prospects (the "Securities Class Action"); and (iv) other publicly available information concerning Xponential.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action asserted on behalf of Nominal Defendant Xponential against certain officers and members of the Company's Board of Directors (the "Board") for the claims asserted herein to recover damages caused to the Company.

2.      At the heart of this action is a fraudulent scheme perpetrated by former CEO Anthony Geisler ("Geisler") and Board Chair Mark Grabowski ("Grabowski") to inflate Xponential's value through deceptive franchise sales practices, both named

as defendants herein. Geisler's history of questionable business practices dates back to his involvement with Interactive Solutions Corp., where he was exposed for using "boiler room" tactics to mislead investors. Despite this background, which Defendants concealed from franchisees and investors, Geisler and Grabowski launched a scheme in 2018 to pursue massive wealth through aggressive franchise expansion.

3.    The Individual Defendants (defined herein) breached their fiduciary duties by causing or allowing Xponential to sell franchise licenses by deliberately misleading prospective franchisees about studio economics. The Company specifically targeted what Geisler called "corporate refugees" – individuals tired of the traditional nine to five work life or looking to invest their 401(k) savings. To lure these prospects, Xponential would fly them to Irvine, California, drive them around in luxury sprinter vans, and wine and dine them at expensive restaurants.

4.    As early as February 2020, franchisees informed Geisler that the Company's Financial Disclosure Documents ("FDDs") showcased a business that would purportedly quickly become profitable. However, buildout costs were substantially more than what was depicted in the FDDs, resulting in delayed studio openings, unprofitable open studios, and deep losses. These misrepresentations were not isolated incidents but reflected a company-wide practice affecting multiple Xponential brands.

5.    Despite knowing that six of Xponential's ten brands and over 60% of studios were operating at a loss, the Individual Defendants continued pushing aggressive growth targets while concealing franchisees' true financial condition. The Individual Defendants maintained the façade by repeatedly claiming Xponential had "never permanently closed a store in the history of our business" and that franchisees had "borrowed over $200 million from the [Small Business Administration ("SBA")]

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1  without any non-repayments." Both claims were false; multiple studios had closed
2  permanently, and several franchisees had defaulted on SBA loans as early as 2019.

3       6.    When franchisees attempted to close failing locations, the Individual
4  Defendants employed threats and intimidation to maintain the façade of success. As
5  reported by multiple sources, Geisler personally threatened one franchisee during
6  mediation, stating he would "cut your f[]ing head[] off and mount [it] on pike[] in
7  front of the building with the note, 'This is what happens when you f[] with Anthony
8  Geisler.'" The Company also required franchisees to sign stringent non-
9  disparagement agreements and sued those who attempted to close unprofitable
10 studios.

11      7.    Geisler even personally monitored franchisee Facebook groups to track
12 and suppress any signs of dissent. According to *Bloomberg Businessweek*, franchisees
13 who made negative comments were kicked out or had their comments deleted. The
14 Individual Defendants also used cross-default provisions in franchise agreements to
15 threaten to take profitable studios if franchisees closed unprofitable ones.

16      8.    The scheme began to unravel in June 2023, when Fuzzy Panda Research
17 ("Fuzzy Panda") published a report exposing the truth about Xponential's operations.
18 Rather than address the allegations, the Individual Defendants issued false denials and
19 continued concealing the Company's problems. However, the risks they had created
20 soon materialized. The Company was forced to take charges of $13.8 million to
21 dispose of failing studios and expected additional charges of up to $27 million in 2024.
22 Bank of America ("BofA") Securities, which had served as a lead underwriter for
23 Xponential's offerings, downgraded the stock and cut its price target in half after
24 *confirming* many of Fuzzy Panda's findings.

25      9.    The Individual Defendants' misconduct has exposed Xponential to
26 substantial liability, including investigations by the SEC, the United States Attorney's
27 Office, and state regulators. These investigations culminated in Geisler's indefinite

28

suspension as CEO in May 2024.  The SEC investigation focuses on "studio closures, communications with franchise owners, financial reporting, and insider trading policies," while the U.S. Attorney's Office has convened a grand jury in connection with a Federal Bureau of Investigations ("FBI") criminal investigation.

10.    The Company now faces multiple lawsuits from franchisees who allege they were financially crushed as a result of the fraud.  Investors have filed securities class actions seeking hundreds of millions in damages, and the reputational damage from these revelations will take years to repair and has severely compromised Xponential's ability to attract new franchisees.

11.    Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company was manipulating their financial metrics by excluding underperforming stores from reported Same Store Sales ("SSS") and average unit volumes ("AUVs") calculations; (ii) the Company had permanently closed at least 30 stores; (iii) 8 out of 10 Xponential brands were losing money monthly; (iv) at least 50% of Xponential studios never make a positive financial return; (v) over 100 franchises were for re-sale at about 75% discount to initial cost; (vi) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates, and operated non-viable studios that had no practical path to profitability; (vii) the Company lacked internal controls; and (viii) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

12.    As a direct and proximate result of the misconduct described herein by Individual Defendants, Xponential has sustained significant damages.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 21D of the Securities Exchange Act ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder, Section 20(a), Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder, and Section 11(f) of the Securities Act of 1933 ("Securities Act").   The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy.   This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

14.     This Court has jurisdiction over each Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.   The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state and has consented to service in this state.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to Xponential.   Venue is also proper pursuant to 28 U.S.C. § 1401 because Nominal Defendant Xponential could have sued the same Defendants in this District.

**PARTIES**

16.     Plaintiff is an Xponential stockholder and has continuously held Xponential stock from the time of the wrongdoing alleged herein until the present. Plaintiff will fairly and adequately represent Xponential's interest in this action.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

17.    Nominal Defendant Xponential is incorporated under the laws of Delaware, and its principal executive offices are located at 17877 Von Karman Avenue, Suite 100, Irvine, California, 92614.  Xponential's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "XPOF."

18.    Defendant Geisler founded the Company and served as CEO and director from 2017 until May 10, 2024.  For the Company's 2023, 2022, and 2021 fiscal years, Geisler was paid over $1.9 million, $6.8 million, and $17 million, respectively, in compensation, including salary and stock awards.  Between February 10, 2023, and March 6, 2024, Geisler sold 1,797,311 shares of Xponential for proceeds of over $48 million as indicated in the chart below:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 2/10/2023 | 1,000,000 | $ 24.50 | $ 24,500,000.00 |
| 3/6/2023 | 35,084 | $ 30.49 | $ 1,069,711.16 |
| 3/6/2023 | 110,445 | $ 30.34 | $ 3,350,901.30 |
| 3/7/2023 | 1,900 | $ 30.25 | $ 57,475.00 |
| 3/31/2023 | 66,200 | $ 30.26 | $ 2,003,212.00 |
| 4/3/2023 | 25,663 | $ 30.97 | $ 794,783.11 |
| 4/3/2023 | 43,592 | $ 31.54 | $ 1,374,891.68 |
| 4/4/2023 | 38,535 | $ 31.04 | $ 1,196,126.40 |
| 4/6/2023 | 200 | $ 31.00 | $ 6,200.00 |
| 4/10/2023 | 47,717 | $ 31.22 | $ 1,489,724.74 |
| 4/11/2023 | 84,709 | $ 31.87 | $ 2,699,675.83 |
| 4/12/2023 | 300 | $ 32.06 | $ 9,618.00 |
| 4/17/2023 | 51,104 | $ 32.15 | $ 1,642,993.60 |
| 4/18/2023 | 57,100 | $ 32.52 | $ 1,856,892.00 |
| 4/19/2023 | 81,570 | $ 32.83 | $ 2,677,943.10 |
| 4/20/2023 | 5,393 | $ 33.05 | $ 178,238.65 |
| 4/28/2023 | 31,453 | $ 33.17 | $ 1,043,296.01 |
| 5/1/2023 | 30,785 | $ 33.21 | $ 1,022,369.85 |
| 5/2/2023 | 4,105 | $ 33.02 | $ 135,547.10 |
| 5/5/2023 | 100 | $ 33.49 | $ 3,349.00 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 5/25/2023 | 13,627 | $ 25.08 | $ 341,831.93 |
| 7/5/2023 | 17,703 | $ 16.67 | $ 295,137.33 |
| 2/27/2024 | 17,901 | $ 9.93 | $ 177,678.17 |
| 3/6/2024 | 32,125 | $ 14.08 | $ 452,265.39 |
| **Total** | **1,797,311** | | **$ 48,379,861.35** |

Geisler is named as a defendant in the Securities Class Action.

19. Defendant Jair Clarke ("Clarke") has served as a member of the Board since July 2022 and has served as a member of the Audit Committee since 2022. For the Company's 2023 and 2022 fiscal years, Clarke was paid $122,594 and $103,272, respectively, in compensation, including fees earned or paid in cash and stock awards.

20. Defendant Grabowski has served as Chair of the Board since May 2015. For the Company's 2023, 2022, and 2021 fiscal years, Grabowski was paid $223,132, $234,000, and $373,949, respectively, in compensation, including fees earned or paid in cash and stock awards. On November 21, 2024, Defendant Grabowski sold over 12.5 million shares of Xponential stock for proceeds of almost $260 million as indicated in the chart below:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 4/11/2022 | 2,479,342 | $ 20.00 | $ 49,586,840.00 |
| 4/11/2022 | 2,695,658 | $ 20.00 | $ 53,913,160.00 |
| 2/10/2023 | 2,083,600 | $ 24.50 | $ 51,048,200.00 |
| 2/10/2023 | 1,916,400 | $ 24.50 | $ 46,951,800.00 |
| 2/17/2023 | 359,325 | $ 24.50 | $ 8,803,462.50 |
| 2/17/2023 | 390,675 | $ 24.50 | $ 9,571,537.50 |
| 11/21/2024 | 1,352,047 | $ 15.35 | $ 20,753,921.45 |
| 11/21/2024 | 1,243,551 | $ 15.35 | $ 19,088,507.85 |
| **Total** | **12,520,598** | | **$ 259,717,429.30** |

Grabowski is named as a defendant in the Securities Class Action.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

21.     Defendant Chelsea A. Grayson ("Grayson") has served as a member of the Company's Board since October 2021 and has served as a member of the Audit Committee since 2021.  For the Company's 2023, 2022, and 2021 fiscal years, Grayson was paid $188,271, $172,125, and $90,646, respectively, in compensation, including fees earned or paid in cash and stock awards.  Grayson is named as a defendant in the Securities Class Action.

22.     Defendant John Meloun ("Meloun") has served as CFO since July 2018. For the Company's 2023, 2022, and 2021 fiscal years, Meloun was paid over $1.2 million, $5 million, and $1.3 million, respectively, in compensation including salary and stock awards.  Between March 6, 2023, and March 6, 2024, Meloun sold 49,861 shares for proceeds of over $1 million as indicated in the chart below:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 3/6/2023 | 23,080 | $ 30.49 | $ 703,709.20 |
| 5/25/2023 | 3,311 | $ 25.20 | $ 83,420.65 |
| 2/27/2024 | 6,160 | $ 10.09 | $ 62,153.17 |
| 3/6/2024 | 17,310 | $ 14.08 | $ 243,733.46 |
| Total | 49,861 | | $ 1,093,016.47 |

Meloun is named as a defendant in the Securities Class Action.

23.     Defendant Brenda Morris ("Morris") has served as a member of the Board since May 2019 and as the Chair of the Audit Committee since at least 2021. For the Company's 2023, 2022, and 2021 fiscal years, Morris was paid $235,648, $214,125, and 162,500, respectively, in compensation, including fees earned or paid in cash and stock awards.  Morris is named as a defendant in the Securities Class Action.

24.     The following Defendants are collectively referenced herein as the "Individual Defendants": Geisler, Clarke, Grabowski, Grayson, Meloun, and Morris.

25.    The following Individual Defendants are collectively referenced herein as the "Director Defendants": Clarke, Grabowski, Grayson, and Morris.

26.    The following Individual Defendants are collectively referenced herein as the "Insider Trading Defendants": Geisler, Grabowski, and Meloun.

27.    The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants": Clarke, Grayson, and Morris.

28.    The following Individual Defendants are collectively referenced herein as the "Exchange Act Defendants": Geisler, Grabowski, and Meloun.

29.    The following Individual Defendants are collectively referenced herein as the "Securities Act Defendants": Geisler, Grabowski, Grayson, Meloun, and Morris.

30.    The Individual Defendants and Nominal Defendant are collectively referenced herein as "Defendants."

## THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

31.    At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in Xponential.

32.    Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

33.    The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

34.     Each of the Company's directors owed and owes to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

35.     Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

36.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Xponential were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

37. The Individual Defendants knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

38. Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Xponential.

39. The Board has adopted Xponential's Code of Business Conduct and Ethics ("Code of Conduct") to "conduct[] [the Company's] business affairs with honesty and integrity and in full compliance with all applicable laws, rules[,] and regulations."

40. The Code of Conduct imposes additional duties and responsibilities on the Individual Defendants, with respect to trading on inside information. Specifically, the Code of Conduct states that "[u]sing non-public, Company information to trade in securities, or providing a family member, friend or any other person with a 'tip,' is illegal" and that "[a]ll non-public, Company information should be considered inside information and should never be used for personal gain or to enable others to gain from trades in our stock." The Code of Conduct continues: "[y]ou are required to

11

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

familiarize yourself and comply with the Company's Insider Trading Policy, copies of which are distributed to all employees, officers and directors and are available from the legal department."

41.    With respect to compliance with the Code of Conduct and the reporting of any illegal or unethical behavior, the Code of Conduct states that "[it] will be strictly enforced and violations will be dealt with immediately, including by subjecting persons who violate its provisions to corrective and/or disciplinary action such as dismissal or removal from office" and that "[v]iolations of the Code [of Conduct] that involve illegal behavior will be reported to the appropriate authorities."  The Code of Conduct continues:

> Situations which may involve a violation of ethics, laws, rules, regulations or this Code may not always be clear and may require the exercise of judgment or the making of difficult decisions.  Employees, officers and directors should promptly report any concerns about a violation of ethics, laws, rules, regulations or this Code to their supervisors/managers and the Legal Department, or, in the case of accounting, internal accounting controls or auditing matters, the Audit Committee of the Board of Directors.
>
> Any concerns about a violation of ethics, laws, rules, regulations or this Code by any employee, directors and officers should be reported promptly to the legal department and the CFO, and the CFO shall notify the Audit Committee of any violation.  Any such concerns involving the legal department or CFO should be reported to the Audit Committee.
>
> *    *    *
>
> The Company recognizes the need for this Code to be applied equally to everyone it covers.  The legal department of the Company

will have primary authority and responsibility for the enforcement of this Code, subject to the supervision of the Audit Committee, and the Company will devote the necessary resources to enable the legal department to establish such procedures as may be reasonably necessary to create a culture of accountability and facilitate compliance with the Code. Questions concerning this Code should be directed to the legal department.

42.     The Company has also adopted the Corporate Governance Guidelines ("Corporate Guidelines"). According to the Corporate Guidelines, "[t]he Board acts as the ultimate decision-making body of the Company and advises and oversees management, who are responsible for the day-to-day operations and management of the Company" and that "[i]n fulfilling this role, each director must act in what he or she reasonably believes to be in the best interests of the Company and must exercise his or her business judgment."

43.     The Corporate Guidelines state that "the Audit Committee shall generally be responsible for overseeing the integrity of the Company's financial statements, its independent auditor, its internal audit function and compliance by the Company with legal and regulatory requirements."

44.     The Corporate Guidelines state that the Disclosure Committee:

•       [S]hall generally be responsible for designing and establishing controls and other procedures to ensure the accuracy and timeliness of the disclosures made by the Company, monitoring the integrity and effectiveness of the Company's disclosure controls and reviewing and supervising the preparation of the Company's required disclosure statements, press releases, communications disseminated to shareholders and presentations to rating agencies and lenders.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

45.    The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Clarke, Grayson, and Morris during the Relevant Period.

46.    Pursuant to the Audit Charter, the overarching duties of the Audit Committee and its members "is to assist the Board in fulfilling its responsibilities for overseeing" the following:

- The Company's accounting and financial reporting processes and internal controls, as well as the audit and integrity of the Company's financial statements.

          *          *          *

- The design and implementation of the Company's internal audit function.

- The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).

- The Company's policies with respect to risk assessment and risk management pertaining to the financial, accounting and tax matters of the Company.

- The Audit Committee is also responsible for preparing the report required by Securities and Exchange Commission ("**SEC**") rules to be included in the Company's proxy statement for the annual meeting of stockholders, and for performing such other duties and responsibilities as are enumerated in or consistent with this charter.

47.    According to the Audit Charter, the Audit Committee "may review and discuss the following with management, the personnel responsible for the design and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

implementation of the internal audit function, and the independent auditor, as applicable":

- The Company's annual audited and quarterly unaudited financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations" should be included in the Company's Form 10-K.

- The results of the independent audit and the quarterly reviews of the Company's financial statements, and the independent auditor's opinion on the annual financial statements.

48. Among the "principle recurring responsibilities" of the Audit Committee are the following:

7. <u>Audit Committee Report</u>. The Audit Committee will prepare the report of the Audit Committee that SEC rules require to be included in the Company's annual proxy statement.

8. <u>Earnings Press Releases and Earnings Guidance</u>. The Audit Committee, or the chairperson of the Audit Committee, shall review, in general, earnings press releases, and review and discuss with management and the independent auditors policies with respect to earnings press releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts and ratings agencies.

9. <u>Internal Controls</u>.  The Audit Committee shall review and discuss with management, the personnel responsible for the design and implementation of the internal audit function, and the independent auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the independent auditor, the personnel responsible for the design and implementation of the internal audit function, or management which are reasonably likely to affect the Company's ability to record, process, summarize and report financial information and any special audit steps adopted or changes required in light of any material control deficiencies, the reports and certifications regarding internal control over financial reporting and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.  The Audit Committee shall also review and discuss with management and the independent auditors, disclosure relating to the Company's internal controls, the independent auditor's report on the Company's internal control over financial reporting (if applicable) and required management certifications to be included in or attached as exhibits to the Corporation's Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q, as applicable.

10. <u>Disclosure Controls and Procedures</u>.  The Audit Committee shall review and discuss the adequacy and effectiveness of the Company's disclosure controls and procedures and the reports and certifications over disclosure controls and procedures.

\*        \*        \*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

12. <u>Legal and Regulatory Compliance</u>.  The Audit Committee may:

\*      \*      \*

• Review and discuss with management and the independent auditor any correspondence with regulators or governmental agencies that raise material issues regarding the Company's financial statements or accounting policies.

• Review and discuss, with a senior member of the Company's legal department and outside legal counsel, any legal and regulatory matters, including legal cases against or regulatory investigations of the Company and its subsidiaries, that may have a material impact on the financial statements or the Company's compliance procedures.

\*      \*      \*

14.  <u>Risk Assessment and Risk Management</u>.  The Audit Committee shall review and discuss with management, the personnel responsible for the design and implementation of the internal audit function, and the independent auditor the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management pertaining to financial, accounting and tax matters.  The Audit Committee may also review the Company's risk management framework and programs, as well as the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SUBSTANTIVE ALLEGATIONS

***Company Background***

49.     Xponential, established in 2017 by Geisler, positions itself as the world's leading franchisor of boutique fitness brands.  Its platform encompasses 10 distinct brands spanning various fitness categories, including Pilates, indoor cycling, barre, stretching, rowing, dancing, boxing, running, functional training, and yoga.

50.     The Company states that its franchise network delivers personalized, accessible workout experiences across 48 U.S. states, the District of Columbia, and Canada.  Additionally, Xponential has established master franchise or international expansion agreements in fourteen other countries.  By the end of 2022, its North American presence included over 1,700 franchisees and agreements for more than 1,900 studios planned to open under existing franchise contracts.

51.     The Company's SEC filings list their portfolio brands as: (1) "Club Pilates, the largest Pilates brand in the United States"; (2) "CycleBar, the largest indoor cycling brand in the United States"; (3) "StretchLab, a concept offering one-on-one and group stretching services"; (4) "Row House, the largest franchised indoor rowing brand in the United States"; (5) "AKT, a dance-based cardio workout combining toning, interval, and circuit training"; (6) "YogaSix, the largest franchised yoga brand in the United States"; (7) "Pure Barre, a total body workout that uses the ballet barre to perform small isometric movements, and the largest barre brand in the United States"; (8) "Stride, a treadmill-based cardio and strength training concept"; (9) "Rumble, a boxing-inspired full-body workout"; and (10) "Body Fit Training, a functional training and strength-based program."

52.     The Individual Defendants launched the Company's initial public offering ("IPO") in July 2021, offering over ten million Xponential shares at $12 per share, including a partial exercise of the underwriters' overallotment option, raising $120 million from investors.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

53.    Following the IPO, the Company conducted additional registered stock offerings, enabling insiders Geisler and Grabowski to sell more shares.

54.    The Company executed a secondary public offering ("SPO") in April 2022, putting 4.5 million shares of Class A common stock up for public sale through Snapdragon Capital Partners' ("Snapdragon") affiliates, which Grabowski controls.

55.    Another SPO followed in February 2023, offering five million shares, with Snapdragon and CEO Geisler serving as the selling stockholders.

56.    While the Company received no proceeds from these transactions, Geisler and Grabowski collected nearly $250 million from the two SPOs while misleading the market about the Company's financial condition.

57.    But Geisler and Grabowski's financial success was based on a scheme to mislead working class people into believing in, and joining, the Xponential franchise concept. They then used the resulting franchise license purchases and studio openings to convince investors that Xponential was experiencing rapid revenue growth through "healthy, happy franchisees." Throughout the Relevant Period, the Individual Defendants reported increasing license sales, increasing studio openings, and growing AUVs – all "key initiatives" that Geisler told investors would "get more revenue and more royalty and reoccurring dollars" for Xponential. As a result, Xponential's stock price increased from an IPO price of $12 per share to a Class Period high of $33.58 per share.

58.    In reality, Xponential secured its revenue growth by selling franchise licenses through grossly inaccurate sales pitches and FDDs, which the Federal Trade Commission ("FTC") requires franchisors to file for potential franchisees to make an informed decision about investing in a franchise. The sales pitches grossly misrepresented profitability estimates while omitting information that would deter people from opening an Xponential franchise, including Defendant Geisler's history of being held liable in multiple lawsuits alleging fraud. As franchisees have alleged

in lawsuits against Xponential brands YogaSix and AKT, they "would not have entered into the Agreements" had this information been disclosed.  The story was the same for all the franchisees – "the company inflated revenue and profit projections based on unrealistic membership numbers and grossly underestimated costs."

59.    As alleged in the Securities Class Action, Xponential internal documents reveal that certain of the Individual Defendants, including Geisler, knew before the IPO that Xponential's license sales were based on fabricated revenue projections and cost estimates.  A February 16, 2020 (a year before the IPO) memo addressed directly to Geisler from franchisees stated that "[t]he revenue estimates in the FDD do not appear to match the reality being experienced by many studios."  A few months later, Defendant Geisler received another document setting forth three major issues with Xponential's Operating Model that caused open studios in Xponential's Row House brand to be unprofitable.  Finally, in a June 22, 2020 letter to Geisler, franchisees wrote that "[t]he issues we've identified translate into delayed studio openings, unprofitable open studios, and deepening losses for both owners and Xponential."

**The Individual Defendants Breach Their Duties**

60.    Through a series of communications, the Individual Defendants breached their fiduciary duties by making or authorizing materially false and misleading statements and failing to disclose material adverse facts about the Company's business, operations, and prospects.

**A.    The Individual Defendants Issue Statements About Xponential's AUV Metric, License Sales, and Studio Openings While Concealing Numerous Risks Created by Their Scheme**

61.    On July 23, 2021, Xponential filed a Registration Statement with the SEC, signed by Defendants Geisler, Meloun, Grabowski, and Morris (the "Registration Statement") and a Prospectus (the "Prospectus") for the IPO.  The

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Prospectus emphasized that AUVs "consists of the average sales for the trailing 12 calendar months for all studios in North America that have been open for at least 13 calendar months as of the measurement date" and described that AUV was among the measures that "aid in understanding how we derive our royalty and marketing revenue and are important in evaluating our performance." The Prospectus noted Xponential's AUV results and its significant growth in studio openings and franchise licenses sold.

62.   The Prospectus stated as follows, in relevant part:

•   increased the number of open studios in North America from 813 as of December 31, 2017 to 1,712 as of December 31, 2020, representing a compound annual growth rate ("CAGR") of 28% and increased the number of open studios in North America from 1,527 as of March 31, 2020 to 1,765 as of March 31, 2021;

•   increased cumulative North American franchise licenses sold from 1,498 as of December 31, 2017 to 3,273 as of December 31, 2020, representing a CAGR of 30%, and increased North American franchise licenses sold to 3,371 as of March 31, 2021. As of March 31, 2021, franchisees were contractually obligated to open a further 1,391 studios in North America . . . ; [and]

\*   \*   \*

•   generated LTM AUV of $449 thousand and $283 thousand in 2019 and 2020, respectively, and $453 thousand and $257 thousand for the three months ended March 31, 2020 and 2021, respectively.

63.   On August 24, 2021, Xponential issued a press release announcing its financial results for the second quarter of 2021 (the "August 24, 2021 Press Release"). The August 24, 2021 Press Release stated the Company had achieved a "[r]ecovery of nearly 90% run-rate AUVs as compared to January 31, 2020, placing the Company on track to reach pre-pandemic run-rate AUVs by early 2022." (Footnote omitted.)

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

64.    During the related earnings call, Geisler discussed the number of franchise licenses sold in the quarter.  In relevant part, Geisler stated that "Xponential had a very strong second quarter, highlighted by our North American performance with 197 franchise licenses sold, 59 studio openings and 179% increase in system-wide sales year-over-year for a total of $171.6 million" and that "from January of 2020 through July of 2021, we have successfully opened 354 new studios across our 9 brands in North America and sold an additional 554 new licenses, including 338 licenses sold year-to-date in 2021."  He continued: "[t]oday, we have over 1,500 licenses contractually obligated to open in North America" and that  "[i]f we were to never sell an additional license, we'd still be able to nearly double our North American studio count over the next several years on these 1,500-plus license obligations alone."

65.    During the same call, Meloun also highlighted the Company's franchise licenses sold and studio openings.  In relevant part, he stated that the Company "had a very strong second quarter with 197 licenses sold and 59 studios opened compared to 46 licenses sold and 56 studios opened in North America during the prior year period."

66.    Meloun further stated that "[t]he significant improvement in licenses sold during the quarter bodes well for our growth in open studios in the future[,]" "[d]uring July alone, we set a record month for systemwide sales[,]" and that Xponential had "sold 43 licenses and opened 21 new studios in North America."

67.    Geisler also discussed the financial circumstances of Xponential's franchisees and the "power" of the Xponential playbook, claiming that it "set[s] [the Company] apart from [its] peers and are the keys to [Xponential's] successful business model." He further touted that the playbook "ensures that [Xponential's] franchisees can maximize their studio performance and enhance their return on investment."

68.    During the call, an analyst inquired about "the health of the franchisees and their willingness to continue the club growth in this environment" and whether

the Company was "seeing any hesitation from the franchisees in terms of studio openings." In response, Meloun stated, in relevant part:

> In regards to hesitation, looking at our run rate AUVs and our LTM AUVs, they continue to recover and grow up into the right. So we're seeing really strong trends as far as system-wide sales, same-store studio sales, AUV growth, memberships, growing. Visitation continues to remain on trend and growing up into the right. So as far as hesitation is concerned, we haven't seen anything through the second quarter, talking through where we are in Q3.

69. On August 25, 2021, Xponential filed with the SEC its second quarter 2021 Form 10-Q for the quarter ended June 30, 2021, signed by Meloun (the "Q2 2021 Form 10-Q"). The Q2 2021 Form 10-Q included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that the filing was free from fraud, accurate, and materially complete, signed by Geisler and Meloun. The Q2 2021 Form 10-Q contained the same statements regarding Xponential's purported quarterly results contained in the August 24, 2021 Press Release, including statements about AUV and studio openings.

70. On November 11, 2021, Xponential issued a press release announcing its third quarter of 2021 financial results (the "November 21, 2021 Press Release"). The November 21, 2021 Press Release stated the Company had achieved a "[n]early 90% North American run-rate average unit volume (AUV) recovery compared to January 31, 2020."

71. During the related earnings call, Geisler discussed that during the third quarter, the Company sold "248 franchise licenses, bringing us back to pre-COVID franchise license sales levels" and that Xponential had "opened 68 new studios and increased [its] North American systemwide sales 93% year-over-year for a total of $192.4 million, [its] fifth consecutive quarter of increased systemwide sales."

72.     With respect to studio growth, Geisler stated "[t]oday, we have over 1,600 licenses contractually obligated to open in North America."  He again assured investors that "[i]f we were to never sell an additional license, we'd still be able to nearly double our North American studio count over the next several years on these license obligations alone" and that "[w]ith strong franchisee demand for new licenses and strong sales, our backlog of studios obligated to open is continuously replenished and offers us solid visibility into our long-term growth."

73.     During the call, Meloun also emphasized that the Company "had a strong third quarter with 248 licenses sold and 68 studios opened compared to 50 licenses sold and 80 studios opened during the prior year period," resulting in a "significant improvement in licenses sold during the quarter [and] provid[ing] visibility into new studio growth."

74.     On November 12, 2021, Xponential filed with the SEC its third quarter 2021 Form 10-Q for the quarter ended September 30, 2021, signed by Meloun (the "Q3 2021 Form 10-Q").  Attached to the Q3 2021 Form 10-Q were certifications pursuant to SOX signed by Geisler and Meloun, attesting that the filing was free from fraud, accurate, and materially complete.  The Q3 2021 Form 10-Q contained restated financial results disclosed in the November 21, 2021 Press Release.

75.     On March 3, 2022, Xponential issued a press release announcing its fourth quarter and full-year 2021 financial results (the "March 3, 2022 Press Release").  The March 3, 2022 Press Release stated the Company had achieved a run-rate AUV of $446,000 for the quarter, compared to a run-rate AUV of $287,000 in the prior-year period.

76.     During the related earnings call, Geisler discussed the number of franchise licenses sold and the number of studios opened in the quarter stating, "[w]e are extremely proud of the operational accomplishments that drove our record financial performance in 2021, which further provides us great momentum into 2022"

He continued, "[o]n a pro forma basis, including our 2 new brands, Rumble and BFT, Xponential sold 955 franchise licenses and opened 334 new studios across 9 countries." He further stated that the Company's "2021 new studio cohort of 238 North American studios added almost $50 million to the over $700 million in system-wide sales generated in 2021."

77. During the Call, Geisler also stated that the Company "experienced strong demand for our franchise licenses, selling 301 licenses in Q4 pro forma for BFT," bringing Xponential's "2021 quarterly average to almost 250 licenses sold per quarter or a run rate of almost 1,000 licenses sold, creating a solid new studio growth opportunity as we head into 2022, driven primarily by our younger brands."

78. Defendant Geisler further noted that the Company's "Q4 North American system-wide sales grew for the sixth consecutive quarter, increasing 76% year-over-year" and that Xponential "ended the year with North American Q4 run rate AUVs of $446,000, up 56% compared to 2020." Geisler attributed this "ongoing success" to the Company's "ability to proactively manage the health of [its] franchise system."

79. Finally, Geisler said during the call that "[t]oday, we have over 1,800 licenses contractually obligated to open in North America" and touted that "[i]f we were to never sell an additional license, we'd still be able to nearly double our North American studio count over the next several years on these license obligations alone."

80. On March 7, 2022, Xponential filed its full-year 2021 annual report on Form 10-K with the SEC signed by Geisler and Meloun (the "2021 Form 10-K"). Attached to the 2021 Form 10-K were certifications pursuant to SOX signed by Geisler and Meloun attesting that the filing was free from fraud, accurate, and materially complete. The 2021 Form 10-K contained substantially similar statements regarding Xponential's quarterly results contained in the March 3, 2022 Press Release.

81.    The 2021 Form 10-K also discussed "[h]ighly attractive and predictable studio-level economics" stating that "[t]he Xponential Playbook is designed to help franchisees achieve compelling AUVs, strong operating margins and an attractive return on their invested capital."  The 2021 Form 10-K continued: "[o]ur model is generally designed to generate, on average under normal conditions, an AUV of $500,000 in year two of operations and studio-level operating margins ranging between 25% and 30%, resulting in an unlevered cash-on-cash return of approximately 40%."  The 2021 Form 10-K defined that "[a] studio reaches 'base maturity' when it has annualized monthly revenues in the $400,000 to $600,000 AUV range."

82.    On May 12, 2022, Xponential issued a press release announcing its first quarter 2022 financial results (the "May 12, 2022 Press Release").  The May 12, 2022 Press Release stated the Company had achieved a run-rate AUV of $450,000 for the quarter.

83.    During the related earnings call, Geisler said that the Company had "reached a significant milestone in the month of March with monthly run rate North American AUV of $477,000."  He continued, saying that Xponential "ended the quarter with 2,229 global studios, the largest studio count in our company's history" and that "[h]aving opened 99 net new studios in the first quarter as expected, we remain on track to open over 500 new studios this year."

84.    During the call, Geisler also emphasized that the Company had "experienced strong demand for our franchise licenses, selling 260 licenses globally in Q1."  With respect to North America, Geisler assured investors that Xponential "ha[d] over 1,800 licenses sold and contractually obligated to open and ha[d] a replenishing pipeline of organic new studio expansion offering us 4 to 5 years of visibility into our long-term growth."

85.    On May 13, 2022, Xponential filed its first quarter 2022 report on Form 10-Q with the SEC, signed by Meloun (the "Q1 2022 Form 10-Q").  Attached to the Q1 2022 Form 10-Q were certifications pursuant to SOX signed by Geisler and Meloun, attesting that the filing was free from fraud, accurate, and materially complete.  The Q1 2022 Form 10-Q contained the same statements included in the May 12, 2022 Press Release regarding the Company's financial results, AUV statements, license sales, and studio openings.

86.    On July 27, 2022, Xponential issued a press release pre-announcing its second quarter 2022 financial results (the "July 27, 2022 Press Release").  The July 27, 2022 Press Release included a preliminary run-rate AUV of $480,000.

87.    On August 11, 2022, Xponential issued a press release announcing its second quarter 2022 financial results (the "August 11, 2022 Press Release").  The August 11, 2022 Press Release stated the Company had achieved a run-rate AUV of $480,000 for the quarter.

88.    During the related earnings call, Geisler and Meloun repeated the Company's AUV results, stating the Company had "ended the quarter with run rate North American AUVs of $480,000, up from $384,000 year-over-year" and that the Company expected continued growth in the near future.

89.    Geisler also touted studio openings by saying "as we continue to open more studios and as AUVs continue to grow, our profitability increases," and assured investors that "[s]tudio openings are not expected to slow anytime soon, continuing to drive profitability."  He continued: "[w]e ended the quarter with 2,357 global studios, opening 128 net new studios in the second quarter."  Regarding demand for its licenses, Geisler said that Xponential "also experienced strong demand for our franchise licenses, selling 251 licenses globally in Q2, maintaining our annualized run rate of 1,000 licenses per year."  With respect to North America, Geisler said "we have almost 1,900 licenses sold and contractually obligated to open and have a

replenishing pipeline of organic new studio expansion, offering us 4 years to 5 years of visibility into our growth."

90.     During the call, an analyst asked for "an update just on your franchisees' unit economics" and whether Xponential's "franchisees [were] starting to see inflation show up on the cost side, especially just on the labor rent or financing side that are offsetting that AUV accretion."  In response, Geisler stated, in relevant part:

> So our employees are already paid kind of above the minimum wage.  So as minimum wage or the labor side increases, we're not really seeing any labor or wage inflation.  And so the stores are continuing to operate profitably.  Obviously, we opened more units in Q2 than we did in Q1, continued to sell at the current 250 or more pace per quarter.  So at the top of the funnel, we're seeing franchisees want to continue to buy more franchises and we're seeing franchisees continuing to want to open as we see AUVs continue to grow.  So the economics are still strong.

91.     On August 12, 2022, Xponential filed its second quarter 2022 Form 10-Q with the SEC, signed by Meloun (the "Q2 2022 Form 10-Q").  Attached to the Q2 2022 Form 10-Q were certifications pursuant to SOX signed by Geisler and Meloun, attesting that the filing was free from fraud, accurate, and materially complete.  The Q2 2022 Form 10-Q contained substantially similar statements as those reported in the August 11, 2022 Press Release.

92.     On November 10, 2022, Xponential issued a press release announcing its third quarter of 2022 financial results, stating that the Company had achieved a run-rate AUV of $489,000 for the quarter (the "November 10, 2022 Press Release").

93.     During the related earnings call, Geisler repeated the AUV figures included in the November 10, 2022 Press Release, stating that the Company's "Q3 North American system-wide sales also continued to grow, up 37% year-over-year to

$265 million." He also noted: "[f]inally, we ended the third quarter with run rate North American AUVs of $489,000, up from $417,000 year-over-year" and that "AUVs for the month of September reached 496,000, underscoring the continued momentum in the business."

94.    During the call, Meloun discussed the Company's AUV, assuaging investors that Xponential's "younger brands" were opening over $500,000 AUV and stating that the figure could increase to the "high 600s" from its current level. In relevant part, Meloun stated:

> So when you look at the brands, I mean, it's the brands that take off earlier, typically are the ones that have the highest maturity from an AUV. So the things that we talked about on prior earnings calls, that's given us really good optimism around some of the younger brands is brands like Rumble and BFT and even our stretch lab, which I would say is kind of in the middle innings of—it's been around for a while and growing. They're churning out much higher AUVs than we've historically seen from Club Pilates. Anthony mentioned early on, Club Pilates had an AUV that was like kind of sub-300, now it's sitting 750,000-plus per studio. Our [stretch] labs are approaching that, and it's a much younger brand. You look at club Rumble and you look at BFT, the early—again, small sample set, but the early units that are opening up are opening up well above like that 500 AUV. So as these brands continue to mature, I think even the younger ones will continue to push well above that 500 AUV, which we have always defined as the design for AUV, not the MAX, like we never saw the MAX AUV prior to COVID.
>
> So now that the system has gotten back to pre-Covid levels, and we're starting to see all these brands start to perform well above that

500.  I don't think you'll see that as the cap.  I think that's just kind of the ante to get to play where you get to that point of where the brand is expected to perform to, but well above that, we'll see the brands performing 500, 550 as they kind of age and get more units open.

*    *    *

With that, obviously, AUVs will continue to climb.  What is that ceiling at which you kind of—it's kind of like a car, right, and they can only go so fast because at some point, they're pushing through air and it's hard to move faster and faster.  But I think our AUVs, we don't know where that's at yet.  Is it possible that we do see getting to the high 600s?  I do think that's definitely a possibility having the entire system pushing close to 600,000 AUV.  We're at $500,000 roughly now, and we're definitely not slowing down from a growth perspective.

95.    During the same call, Geisler also discussed the number of franchise licenses sold and new studio openings in the quarter, stating the Company "ended Q3 with 2,485 global open studios opening 128 net new studios in the third quarter," and "year-to-date, we have opened 355 new studios, putting us on track to reach our goal of 500-plus new studios for the year."

96.    Geisler continued, asserting that Xponential "franchisees opened 36 studios in the last week of September" and that the Company had "also experienced strong demand for our franchise licenses, selling 258 licenses globally in Q3 and 769 thus far this year."  With respect to North America, Geisler represented that the Company had "over 1,900 licenses sold and contractually obligated to open."

97.    In response to an analyst's question regarding the licenses sold and whether the rate at which new studios were opening was sustainable, Geisler claimed that "we had 120 [licenses] sold," selling "139 [] in September alone" and assured investors that the "franchise sales [were] very strong."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

98.    Also on November 10, 2022, Xponential filed its third quarter 2022 report on Form 10-Q with the SEC on September 30, 2022, signed by Meloun (the "Q3 2022 Form 10-Q").  Attached to the Q3 2022 Form 10-Q were certifications pursuant to SOX signed by Geisler and Meloun, attesting that the filing was free from fraud, accurate, and materially complete.  The Q3 2022 Form 10-Q contained substantially similar statements as those reported in the November 10, 2022 Press Release.

99.    On March 2, 2023, Xponential issued a press release announcing its fourth quarter and full-year 2022 financial results, stating that the Company had achieved a run-rate AUV of $522,000 for the fourth quarter (the "March 2, 2023 Press Release").

100.    During the related earnings call, Geisler emphasized that the Company "ended 2022 with fourth quarter run rate North American AUVs of $522,000, up from $446,000 in Q4 of 2021," purportedly representing "the 10th straight quarter of AUV growth."

101.    During the earnings call, an analyst inquired how the Company's "highest AUV studios [were] doing" and if "there [was] anything unusual about [them] [o]r [was] it just a matter of time before they sort of get to those levels."  Geisler responded that "what's nice is that we're at an all-time company high AUV and our new stores that are opening in those new brands are opening at that AUV and higher while brands like Club Pilates, or Stretch Lab their individual AUVs continue to climb as well as we comp year-over-year at double digits."

102.    During the call, Geisler further touted the purported number of new studio openings and franchise licenses sold in the quarter.  Specifically, he stated that the Company "ended Q4 with 2,641 global open studios, opening 156 net new studios in the fourth quarter alone" and that "[f]or the full year, we opened 511 net new studios globally or a new studio opening approximately every 17 hours."  He continued: "[w]e

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

also experienced strong demand for our franchise licenses, selling 257 licenses globally in Q4, bringing total sold licenses to 5,450."  Finally, regarding North America segment, Geisler touted that the Company had "almost 2,000 licenses sold and contractually obligated to open."

103.    During the call, Meloun similarly highlighted Xponential's franchise licenses sold and new studio openings.  During the call, an analyst asked "[f]or 2023, did you say what's baked in your guidance or what you're targeting for sales of new franchise licenses?" and "how is the evolving macroeconomic backdrop factored into that target?"  Meloun responded, "[i]n regards to the license sales, I mean when you look at what we did in 2022, we did 1,000 licenses, about 250 on average a quarter" and assured investors that for 2023 the Company would "continue to sell through the available inventory that's out there or white space that's out there."

104.    On March 6, 2023, Xponential filed with the SEC its Form 10-K for the year ended December 31, 2022 (the "2022 Form 10-K") signed by Clarke, Geisler, Grabowski, Grayson, Meloun, and Morris.  Attached to 2022 Form 10-K were certifications pursuant to SOX, signed by Geisler and Meloun, attesting that the filing was free from fraud, accurate, and materially complete.  The 2022 Form 10-K contained substantially similar statements as those reported in the March 2, 2023 Press Release, including statements about AUV, license sales, and studio openings.

105.    The 2022 Form 10-K also discussed the Company's "[h]ighly attractive and predictable studio-level economics," including that the model the Company was having franchisees use would generate "AUV of $500,000 in year two of operations." Specifically, the 2022 Form 10-K included that the "Xponential Playbook is designed to help franchisees achieve compelling AUVs, strong operating margins and an attractive return on their invested capital."  The 2022 Form 10-K continued:

> Our model is generally designed to generate, on average under normal conditions, a weighted average AUV of $500,000 in year two

of operations and studio-level operating margins ranging between 25% and 30%, resulting in an unlevered cash-on-cash return of approximately 40%. A studio reaches "base maturity" when it has annualized monthly revenues of approximately $400,000.

106. On May 4, 2023, Xponential issued a press release announcing its first quarter 2023 financial results, stating that the Company had achieved a run-rate AUV of $542,000 for the quarter (the "May 4, 2023 Press Release").

107. During the related earnings call, Geisler highlighted the Company's purported strong AUV growth, stating "Q1 North American AUVs of 542,000 were up 21% from $450,000 in Q1 of 2022, our 11th straight quarter of AUV growth."

108. During the call, Geisler also noted the number of franchise licenses sold in the quarter. In relevant part, Geisler stated that the Company's "franchisees now operate over 2,750 studios globally, an increase of 24% year-over-year with more than 5,600 licenses sold across our 10 leading fitness brands" and that "[f]or the quarter, North American studios over 3 years old comped at 21% same-store sales." During the call, Geisler continued, saying "[b]eginning with the increase of our franchise studio base, we ended Q1 with 2,756 global open studios opening 115 net new studios in the first quarter" and that the Company "sold 188 licenses globally in Q1, bringing the total sold licenses to 5,638."

109. During the call, Meloun attributed the Company's North American system-wide sales growth, in part, to new studio openings in the quarter:

> First quarter North America system-wide sales of $317.8 million were up 42% year-over-year. The growth in North American system-wide sales was largely driven by the 20% same-store sales in the existing base of Open [studio] that continue to acquire new members, coupled with 82 net new North American [studios] that opened in the first quarter.

110.   Also during the call, an analyst asked about Company franchisee financial health, asking "[i]f we look at the cash on cash returns that your franchisees are earning today, what does that look like versus when you went public?"  Geisler responded: "[s]o I think if you talk about pre-COVID when we were just under kind of the 500,000 AUV[,] [a]nd then now you fast forward, we've met that now exceeded it."  He continued: "[o]bviously, the cash-on-cash returns and the overall profitability and strength of the franchisee is better today than it was pre-COVID. . . .  [b]ut overall, today, you would argue franchisees are much healthier, more profitable than they have been ever in the company's history."

111.   On May 5, 2023, Xponential filed with the SEC its 1Q 2023 Form 10-Q for the quarter ended March 31, 2023 signed by Meloun (the "Q1 2023 Form 10-Q"). Attached to the Q1 2023 Form 10-Q were certifications pursuant to SOX signed by Geisler and Meloun attesting that the filing was free from fraud, accurate, and materially complete.   The Q1 2023 Form 10-Q contained substantially similar statements as those reported in the May 4, 2023 Press Release.

112.   The above statements identified in ¶¶ 61-111 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company was manipulating their financial metrics by excluding underperforming stores from reported SSS and AUV calculations; (ii) the Company had permanently closed at least 30 stores; (iii) 8 out of 10 Xponential brands were losing money monthly; (iv) at least 50% of Xponential studios never make a positive financial return; (v) over 100 franchises were for re-sale at about 75% discount to initial cost; (vi) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates, and operated non-viable studios that had no practical path to profitability; (vii) the Company lacked internal controls; and (viii) as a result of the foregoing, the Individual Defendants'

positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

**B.     The Individual Defendants Misled Investors with False Claims That Xponential Had Not Experienced Any Studio Closures and Had Not Defaulted on a Single SBA Loan**

113.    On August 24, 2021, during the Company's second quarter 2021 earnings call, the Individual Defendants began with their "no permanent closure" rhetoric. During the call, Geisler claimed that "[t]hroughout our company's history, including during the COVID-19 pandemic, we have never had a single permanent studio closure."

114.    On September 14, 2021, Geisler attended the Raymond James Consumer Conference where he stated that the Company "delivered over twenty million workouts in 2020. . . . with zero permanent closed stores prior to COVID, and we are happy to report zero permanent closed stores after COVID[,] [s]o 100% of our studios have been open since the last quarter."  Geisler further stated, in relevant part:

> That was evident going into COVID that we had selected really great franchisees that were doing really well, and the model was really great.  Because how do you go into something like a pandemic, that you didn't plan for, with zero closed stores and come out with zero closed stores?  The only way that happens is if you have great franchisees that are doing a great job and a great business model that actually works— is the only answer for how you end up with those types of metrics.
>
> *       *       *
>
> Well, 100% of our studios closed in May—in March and April. 100% of those studios reopened.  And with zero corporate layoffs, we kept 100% of our people working, making 100% of their money.

During 2020 alone, we grand opened 241 units; about 350 have opened since the pandemic.  But just in 2020 alone, 241.  And of course, as I've said, we closed zero stores during that time.

115.   On March 7, 2022, Geisler presented at the Raymond James Institutional Investors Conference and assured investors that Xponential "ha[d] never permanently closed the store in the history of our business" and that despite the fact the Company "actually closed about 1,500 stores temporarily for COVID," it had "opened up 25% more than that when we reopened."

116.   On March 8, 2022, Xponential presented at the Bank of America Consumer & Retail Technology Conference.  During the conference, Geisler repeated "pre-COVID, we've never closed a store; and post COVID, we've never closed a store" and that instead that the Company's store count actually "grew."

117.   On March 14, 2022, Xponential presented at the ROTH Conference.  During the conference, Geisler again represented to investors that "[w]e had never permanently closed a location prior to COVID, and we never did after COVID as well."

118.   On August 11, 2022, during the Company's second quarter 2022 earnings call, Geisler assured investors that Xponential "had 0 studios closed permanently." He also claimed that no franchisee had defaulted on an SBA loan under Xponential's ownership by stating "[o]ur franchisees have borrowed over $200 million from the SBA without any non-repayments under our ownership."

119.   On November 10, 2022, during the Company's third quarter 2022 earnings call, Geisler again addressed the financial health of Xponential's franchisees, repeating that "[o]ur franchisees have also borrowed over $200 million from the SBA without any non-repayment under our ownership."

120.   On January 9, 2023, Meloun presented at the ICR Conference and represented to investors that "[w]e've never closed a company studio in our history,

which shows you the strength of the brand, even with the lower end brands that we have putting off lower AUVs, they still put 25% to 30% margin to the bottom line based off of how they operate the business."

121.   On March 15, 2023, Xponential presented at the Bank of America Consumer & Retail Conference.  During the conference, Meloun assured investors that studio "closures" was "the way to really think about how healthy are our franchisees" and assuaged investors by stating "we don't have closures in our studios."

122.   Geisler added to Meloun's explanation about studio closures at the conference and explained that Xponential "w[ill] take if somebody isn't making margins that are not running the business properly, we will take those stores back, and we will transition those back out into the franchise network or if we have to relocate a location or something like that but the franchise unit itself stays alive and open, and then we'll refranchise them back out."

123.   On May 9, 2023, Geisler appeared on Jim Kramer's Mad Money show to discuss Xponential's quarterly earnings results.  During that discussion, Geisler repeated the misrepresentation that "[w]e've actually never had a closure" of a franchisee studio and added that franchisees, instead of closing, "typically will just transfer to somebody else" after a couple of years and sell at "three and a half to four times EBITDA."

124.   The above statements identified in ¶¶ 113-23 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company had permanently closed at least 30 stores; (ii) 8 out of 10 Xponential brands were losing money monthly; (iii) at least 50% of Xponential studios never make a positive financial return; (iv) over 100 franchises were for re-sale at about 75% discount to initial cost; (v) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition

rates, and operated non-viable studios that had no practical path to profitability; (vi) the Company lacked internal controls; and (vii) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

**C.    Materially False and Misleading Statements and Omissions in the Offering Documents for the Company's Secondary Public Offering**

125.    Between April 2022 and February 2023, the Company conducted two significant secondary stock offerings.  The first offering in April 2022 raised $90 million through the sale of 4.5 million shares at $20 each.

126.    The second offering in February 2023 generated $122.5 million by selling 5 million shares at $24.50 per share.

127.    The Company issued a Registration Statement and Prospectus (the "Secondary Offering Documents") for its SPO held on April 6, 2022.  Defendants Geisler, Grabowski, Grayson, Meloun, and Morris signed the Secondary Offering Documents.

128.    The Secondary Offering Documents were false and misleading in that, among other things, they attributed AUV to the use of the Xponential Playbook and claimed that franchisees would generate AUV of approximately $500,000 in year two of operations.  The Secondary Offering Documents also represented that the Company had generated a run-rate AUV of $287,000 in the fourth quarter of 2020 and $446,000 in the fourth quarter of 2021.  Specifically, the Secondary Offering Documents stated, in relevant part:

> The Xponential Playbook is designed to help franchisees achieve compelling Average Unit Volumes ("AUVs"), strong operating margins and an attractive return on their invested capital.  Studios are

generally designed to be between 1,500 and 2,500 square feet in size, depending on the brand.  The smaller box format contributed to a relatively low average initial franchisee investment of approximately $350,000 in 2021 and 2020.  By utilizing the Xponential Playbook, our model is designed to generate, on average, an AUV of approximately $500,000 in year two of operations and studio-level operating margins ranging between 25% and 30%, resulting in an unlevered cash-on-cash return of approximately 40%.

*        *        *

Highlights of our platform's recent financial results and growth include:

*        *        *

- grew run-rate AUV from $287,000 in the fourth quarter of 2020 to $446,000 in the fourth quarter of 2021, representing an increase of 55%. . . .

129.    The Secondary Offering Documents also highlighted the number of licenses Xponential had sold and the studios that it had opened:

As a franchisor, we benefit from multiple highly predictable and recurring revenue streams that enable us to scale our franchised studio base in a capital efficient manner.  Our system has significant embedded growth based on already-sold licenses for studios that have not yet opened.  As of December 31, 2021, franchisees were contractually obligated to open an additional 1,806 studios in North America.  Converting our current pipeline of licenses sold to open studios in North America would nearly double our existing franchised studio base.  Based on our internal and third-party analyses by Buxton

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Company, we estimate that franchisees could have a total of approximately 7,900 studios in the United States alone.

*    *    *

Highlights of our platform's recent financial results and growth include:

- grew the number of global open studios from 1,796 as of December 31, 2020 to 2,130 as of December 31, 2021, representing an increase of 19%;

- grew global franchise licenses sold from 3,469 as of December 31, 2020 to 4,424 as of December 31, 2021, representing an increase of 28%. . . .

*    *    *

**Large and expanding franchisee base with visible organic growth.**

Our large number of existing licenses sold represents an embedded pipeline to support the continued growth of our business. As of December 31, 2021, on a cumulative basis since inception, we had 4,424 franchise licenses sold globally, compared to 1,508 franchise licenses sold as of December 31, 2017, on an adjusted basis to reflect historical information of the brands we have acquired. Franchisees are contractually obligated to open studios in their territories after purchasing a franchise license. In the event that franchisees are unable to meet their contractual obligations, we have the ability to resell or reassign their territory license(s) to another franchisee in the system or our franchisee pipeline. Based on our experience as a franchisor, we believe that a significant majority of our licenses sold will convert into operating studios. Accordingly, we have the potential to substantially increase our studio base through our existing licenses sold, providing

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

us high visibility into our unit growth and further increasing our already significant scale within the boutique fitness industry.

\*        \*        \*

We have grown our franchised studio footprint in North America from 813 open studios across 47 U.S. states, the District of Columbia and Canada as of December 31, 2017 to 1,954 open studios across 48 U.S. states, the District of Columbia and Canada as of December 31, 2021, on an adjusted basis to reflect historical information of the brands we have acquired, representing a CAGR of 25%.  As of December 31, 2021, we had 1,556 franchisees and licenses for 1,806 studios contractually obligated to be opened under existing franchise agreements in North America.  We sold 787 licenses in 2021 compared to 265 licenses in 2020 and 923 licenses in 2019 in North America.

130.   The above statements identified in ¶¶ 128-29 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors, *inter alia*, that: (i) the Company permanently closed at least 30 stores; (ii) the Company's reported SSS and AUV data had been misstated by excluding the underperforming stores; (iii) eight out of 10 of the Company's brands were operating at a net loss monthly; (iv) the majority of the Company's store brands were operating at a net loss; (v) more than 60% of the Company's revenue was one-time and not recurring; (vi) over 100 of the Company's franchises were for sale at a net price that was at least 75% lower than their initial cost; (vii) the Company had deceived many of its franchisees into opening franchises by misrepresenting the financial profitability and profile of its studios, in addition to the anticipated rate of return for new studio openings; (viii) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates, and operated non-viable

studios that had no practical path to profitability; (ix) the Company lacked internal controls; and (x) as a result of the foregoing, the Securities Act Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

131.    The Secondary Offering Documents were false and misleading and omitted to state facts necessary to make other statements made not misleading, including that the Individual Defendants were procuring license sales, studio openings, and growing AUVs through inaccurate and misleading sales information given to prospective franchisees.

132.    In addition to the materially false and misleading statements in the Secondary Offering Documents identified above, the Securities Act Defendants also violated their affirmative obligations to provide certain material information in the Offering Documents as required by applicable SEC rules and regulations.

133.    Item 303 of SEC Regulation S-K, 17 C.F.R § 229.303 ("Item 303"), required the Secondary Offering Documents to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

134.    The failure of the Secondary Offering Documents to disclose that Xponential was selling franchise licenses using inaccurate FDDs, and the adverse economic circumstances various franchisees were facing as a result, violated Item 303 because these undisclosed facts, trends, and uncertainties were known and would and did have an unfavorable impact on the Company's sales, revenues, and income from continuing operations.

135.    In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105 ("Item 105"), required, in the "Risk Factors" section of the Secondary Offering Documents, a discussion of the most significant factors that made the SPO risky or speculative and that each risk factor adequately describe the risk.    Because the Securities Act

Defendants omitted material facts as well as the consequent material adverse effects on the Company's results and prospects, the Defendants violated Item 105.

136.    In negligent violation of Item 105 and Item 303, the Secondary Offering Documents failed to disclose that Xponential was selling franchise licenses using inaccurate FDDs, and the adverse economic circumstances various franchisees were facing as a result, specifically, that: (i) Xponential was misrepresenting its AUV metric; and (ii) a significant number of Xponential franchisees were losing money every month as a result of misrepresentations and omissions in Xponential's FDDs.

137.    During this period, Defendants Geisler and Grabowski reaped substantial financial benefits.    Defendant Geisler initially earned $9 million from a side transaction with Xponential during the IPO.  He then proceeded to sell significant portions of his holdings in 2023, particularly between March 6 and May 25, when he sold $21.8 million worth of shares.  In total, Defendant Geisler liquidated 79% of his Class A common stock and 23.3% of his overall holdings, generating $55.6 million in proceeds.

138.    Meanwhile, Defendant Grabowski conducted even larger sales through the secondary offerings, selling 59.1% of his Class A common stock and 40.9% of his Class B common stock, amassing $219.8 million in proceeds.  Together, Defendants Geisler and Grabowski accumulated nearly $400 million through their stock sales, spanning from Xponential's IPO in July 2021 through the present.

**D.    The Company Issues False and Misleading Proxy Statements**

139.    On April 5, 2022, Xponential filed a Schedule 14A with the SEC (the "2022 Proxy").    Defendants Geisler, Grabowski, Grayson, and Morris solicited proxies to vote at the annual stockholder meeting via the 2022 Proxy.  The 2022 Proxy contained material misstatements and omissions.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

140.   The 2022 Proxy asked Xponential stockholders to vote to, among other things: (1) re-elect Defendant Morris to the Board for a three-year term ending as of the Company's annual meeting of stockholders in fiscal year 2025, and (2) ratify the appointment of Deloitte & Touche LLP as Xponential's independent registered public accounting firm for the fiscal year ending December 31, 2022.

141.   Regarding the responsibilities of the Company's Board regarding risk oversight, the 2022 Proxy states as follows:

**Board Leadership Structure and Role in Risk Oversight**

*    *    *

Risk assessment and oversight are an integral part of our governance and management processes.  Our Board of Directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations.  Throughout the year, senior management reviews the risks facing us with the Board of Directors at regular Board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks.  Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of the Board of Directors that address risks inherent in their respective areas of oversight.  In particular, our Board of Directors is responsible for monitoring and assessing strategic risk exposure, including risks related to the COVID-19 pandemic, and our Audit Committee is responsible for overseeing our financial and cybersecurity risk

exposures and the steps our management has taken to monitor and control these exposures.

The Audit Committee also monitors compliance with legal and regulatory requirements and considers and approves or disapproves any related person transactions. Our Nominating and Corporate Governance Committee monitors the effectiveness of the Corporate Governance Guidelines. Our Compensation Committee assesses risks arising from our compensation policies and practices and whether any such risks are reasonably likely to have a material adverse effect on us. The Board does not believe that its role in the oversight of our risks affects the Board's leadership structure.

142.  Regarding the responsibilities of the Company's Disclosure Committee, the 2022 Proxy states as follows:

**Disclosure Committee**

In addition to the standing committees of the Board, we maintain a Disclosure Committee. The members of our Disclosure Committee [include] [Defendant] Meloun[.]  Mr. Meloun is the chair of our Disclosure Committee. Our Disclosure Committee is responsible for, among other things:

- designing and establishing controls and other procedures to ensure accurate and timely disclosures of the Company's information;
- monitoring the integrity and effectiveness of, and evaluating the effectiveness of, the Company's disclosure controls;
- reviewing and supervising the preparation of the Company's SEC filings, press releases, stockholder communications, and investor presentations; and

45
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- such other responsibilities as the Board may assign from time to time.

143.    On March 31, 2023, Xponential filed a Schedule 14A with the SEC (the "2023 Proxy").    Defendants Geisler, Clarke, Grabowski, Grayson, and Morris solicited proxies to vote at the annual stockholder meeting via the 2023 Proxy.  The 2023 Proxy contained material misstatements and omissions.

144.    The 2023 Proxy asked Xponential stockholders to vote to, among other things: (1) re-elect Defendants Grayson and Clarke to the Board for a three-year term ending as of the Company's annual meeting of stockholders in fiscal year 2026, and (2) ratify the appointment of Deloitte & Touche LLP as Xponential's independent registered public accounting firm for the fiscal year ending December 31, 2023.

145.    Regarding the responsibilities of the Company's Disclosure Committee, the 2023 Proxy states as follows:

**Disclosure Committee**

In addition to the standing committees of the Board, we maintain a Disclosure Committee consisting of our management members, including the [CFO] [Defendant Meloun], President and Chief Legal Officer, and our [CFO] currently serves as the Chair of the Disclosure Committee.  Our Disclosure Committee is responsible for, among other things:

- designing and establishing controls and other procedures to ensure accurate and timely disclosures of the Company's information;

- monitoring the integrity and effectiveness of, and evaluating the effectiveness of, the Company's disclosure controls;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- reviewing and supervising the preparation of the Company's SEC filings, press releases, stockholder communications, and investor presentations; and

- such other responsibilities as the Board may assign from time to time.

146. On April 18, 2024, Xponential filed a Schedule 14A with the SEC. (the "2024 Proxy"). Defendants Geisler, Clarke, Grabowski, Grayson, and Morris solicited proxies to vote at the annual stockholder meeting via the 2024 Proxy. The 2024 Proxy contained material misstatements and omissions.

147. The 2024 Proxy asked Xponential stockholders to vote to, among other things: (1) re-elect Geisler and Grabowski to the Board for a three-year term ending as of the Company's annual meeting of stockholders in fiscal year 2027, and (2) ratify the appointment of Deloitte & Touche LLP as Xponential's independent registered public accounting firm for the fiscal year ending December 31, 2023.

148. Regarding the responsibilities of the Company's Board in relation to risk oversight, the 2023 Proxy and 2024 Proxy similarly state:

**Board Leadership Structure and Role in Risk Oversight**

\*      \*      \*

Risk assessment and oversight are an integral part of our governance and management processes. Our Board of Directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Throughout the year, senior management reviews the risks facing us with the Board of Directors at regular Board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by

management to mitigate or eliminate such risks. Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing committees of the Board of Directors that address risks inherent in their respective areas of oversight. In particular, our Board of Directors is responsible for monitoring and assessing strategic risk exposure and our Audit Committee is responsible for overseeing our financial and cybersecurity risk exposures and the steps our management has taken to monitor and control these exposures.

The Audit Committee also monitors compliance with legal and regulatory requirements and considers and approves or disapproves any related person transactions. Our Nominating and Corporate Governance Committee monitors the effectiveness of the Corporate Governance Guidelines. Our Human Capital Management Committee assesses risks arising from our compensation policies and practices and whether any such risks are reasonably likely to have a material adverse effect on us. The Board does not believe that its role in the oversight of our risks affects the Board's leadership structure.

149. Regarding the Company's Code of Conduct, the 2022 Proxy, 2023 Proxy, and 2024 Proxy contain substantially similar statements with respect to the Company's Code of Conduct:

**Code of [Conduct]**

We have a written Code of Business Conduct and Ethics that applies to our directors, officers and employees, including our principal executive officer, principal financial officer, principal accounting officer, controller, or persons performing similar functions. We have

posted a current copy of the Code of Business Conduct and Ethics on our investor relations website, *investor.xponential.com*, in the "Governance" section under "Governance Documents." In addition, we intend to post on our website all disclosures that are required by law or the NYSE rules concerning any amendments to, or waivers from, any provision of the Code of Business Conduct and Ethics.

150.  Regarding the Company's Anti-Hedging Policy, the 2022 Proxy, 2023 Proxy, and 2024 Proxy stated:

**Anti-Hedging Policy**

Our Board of Directors has adopted an Insider Trading Policy, which applies to all of our directors, officers and employees. The policy prohibits our employees and directors from engaging in any hedging transactions (including transactions involving options, puts, calls, prepaid variable forward contracts, equity swaps, collars and exchange funds or other derivatives) that are designed to hedge or speculate on any change in the market value of the Company's equity securities.

151.  Regarding the responsibilities of the Company's Audit Committee, the 2022 Proxy, 2023 Proxy, and 2024 Proxy stated:

Our Audit Committee is directly responsible for, among other things:

- selecting a firm to serve as the independent registered public accounting firm to audit our financial statements;

- ensuring the independence and qualifications of the independent registered public accounting firm;

- discussing the scope and results of the audit with the independent registered public accounting firm and reviewing, with

49

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

management and that firm, our interim and year-end operating results;

- establishing procedures for employees to anonymously submit concerns about questionable accounting or audit matters;

- considering the adequacy of our internal controls and internal audit function;

- reviewing material related party transactions or those that require disclosure; and approving or, as permitted, pre-approving all audit and non-audit services to be performed by the independent registered public accounting firm.

152. The 2022 Proxy, 2023 Proxy, and 2024 Proxy were materially misleading because they failed to disclose that: (i) although Xponential claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated the Code of Conduct; (ii) contrary to the 2022 Proxy's, 2023 Proxy's, and 2024 Proxy's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting Xponential to issue false and misleading statements; and (iii) the Individual Defendants allowed the Insider Trading Defendants to sell stock at artificially inflated prices while in possession of material non-public information.

153. The 2022 Proxy, 2023 Proxy, and 2024 Proxy were also materially misleading because they failed to disclose to investors, *inter alia*, that: (i) the Company permanently closed multiple stores; (ii) the Company's reported SSS and AUV data had been misstated by excluding the underperforming stores; (iii) 8 out of 10 of the Company's brands were operating at a net loss monthly; (iv) the majority of the Company's store brands were operating at a net loss; (v) more than 60% of the Company's revenue was one-time and not recurring; (vi) over 100 of the Company's franchises were for sale at a net price that was at least 75% lower than their initial

cost; (vii) the Company had deceived many of its franchisees into opening franchises by misrepresenting the financial profitability and profile of its studios, in addition to the anticipated rate of return for new studio openings; (viii) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates, and operated non-viable studios that had no practical path to profitability; (ix) the Company lacked internal controls; and (x) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading and lacked a reasonable basis.

**E.    The Individual Defendants Continue to Mislead Investors Through Statements in Response to the Fuzzy Panda Report**

154.    On June 27, 2023, Fuzzy Panda published a report titled, "Xponential Fitness (XPOF) – 'Abusive Franchisor That Is A House Of Cards'" (the "Fuzzy Panda Report").[1]    The Fuzzy Panda Report revealed that: (i) Geisler has had a long history of misleading investors; (ii) Xponential hides key figures that show worse Company performance; (iii) many of Xponential's franchisees are losing a substantial amount of money while Xponential increases its fees and kickbacks; (iv) around half of the Company's studios never make a positive financial return; (v) over 100 of the Company's franchises are for sale at a substantial discount from their initial cost; (vi) eight out of ten Xponential brands are losing money monthly; (vii) the Company's AUV metric misleadingly excludes underperforming studios; (vii) Xponential lied in sales pitches to prospective franchisees, including by using false and misleading FDDs; and (viii) at least 30 Xponential stores had been permanently closed.

155.    The Fuzzy Panda Report stated, in relevant part:

- CEO's Secret Past Includes a Bangkok Boiler Room Pump & Dump; Misleading & "Cheating" Partners

---

[1] Plaintiff incorporates by reference the Fuzzy Panda Report.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- Interviews and Disclosure Documents Reveal That Many Franchisees Are Failing & Kickbacks Are Increasing

   Geisler, has a long history of misleading investors and business partners.  XPOF is boutique gym franchisor with 10 different boutique fitness brands.  We discovered XPOF is hiding the fact that many of their brands and franchisees are struggling.

- XPOF CEO, **Geisler, was previously CEO of a reverse merger, pink sheets, pump & dump** called Interactive Solutions (INSC) that **used Bangkok boiler rooms**.
   - He was exposed on camera for using the boiler rooms in the film "Beyond The Boiler Room."

- At Geisler's next venture, LA Boxing, former franchisees, and colleagues of Geisler's described him "**as a crook**" and detailed his many "**scams**" and "**illegal business practices**."
   - Both lawsuits and former franchisees detail how Geisler "**looks people in the eye and lies**."

                              *     *     *

- Investors ha[ve] been impressed [by] Geisler's false claims that at XPOF "**we have never closed a store**."
   - **We found >30 permanently closed stores**.

- XPOF likely is **violating their debt covenants** regarding the number of permanently closed stores they have.

- We went through 64 FDD documents, >16,000 pages.  The FDDs suggest that **8 out of 10 XPOF brands are losing money monthly**.
   - **>50% of XPOF studios never make a positive financial return**.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- o    Franchisees told us "**Everyone is losing money.**"
- We discovered **>100 franchises for Re-Sale at a >75% discount to initial cost**.
  - o    In comparison, we found zero Planet Fitness franchises for resale.
- Franchisees told us that losses were so bad that they **sold their studios back to XPOF for $1**.
- XPOF seems to be making up new financial metrics. Specifically, how they calculate Average Unit Volumes (AUV) and Same Store Sales (SSS).
  - o    FDDs show that XPOF is selectively **EXCLUDING underperforming stores from reported SSS and AUV calculations**.
  - o    Average revenue calculations are **mysteriously missing >95 underperforming studios**.
- Payments to XPOF + "approved suppliers" (aka vendors that pay kickbacks) has increased by an average of 64%
  - o    Franchisees say **XPOF "overcharges them for almost everything."**
  - o    For example, they sell franchisees exercises bikes for 58% more than the cost of a peloton.
  - o    Former franchisees at LA Boxing also accused Geisler of charging far above market rates on equipment to get kickbacks and embezzling of marketing funds.
- **XPOF encourages franchisees to take out SBA loans and/or second mortgages to pay for start-up costs.**
  - o    XPOF Sales reps say 90-95% of franchisees take out SBA

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

loans.

- o Former franchisees say this results in families losing their retirements and entire savings when their fitness studio inevitably fails.

- Most quality franchisors make money from recurring royalty & marketing fees.  At XPOF, **>60% of revenue is one-time and non-recurring.**

- Consumers complain about "illegal billing practices" including continuing to bill consumers credit cards after a studio has been permanently closed.  Some even called it a "1980's style gym scam."

  - o Former colleagues from LA Boxing detailed how Geisler directly approved plans to illegally bill consumer's credit cards.

- **<u>Geisler condones a culture of sexual harassment</u>** both in previous companies and at XPOF.  Colleagues informed us that he had sexual harassment allegations against him all the time and that he would "**discriminate against women that were elderly and overweight**."

  - o A lawsuit also details atrocious sexual harassment violations at XPOF brand, Club Pilates.

                          *       *       *

- **The house of cards is starting to fall** – XPOF takes money-losing studios with long-term leases called "transition studios" onto their own Balance Sheet.

  - o **<u>The number of loss-making studios on Balance Sheet has increased by >4x YoY</u>**

54

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

o  **Re-sales of transition studios has slowed dramatically.**

- **Massive Insider Stock Sales** – If you do not believe anything we said, then pay attention to the fact that Geisler and sophisticated insiders sold >$167 million of stock in 2023.

156.   The price of Xponential common stock fell more than ***37%*** in response to the Fuzzy Panda Report.  However, the Individual Defendants continued to disseminate materially false and misleading statements and omissions and failed to disclose the full truth, causing the price of Xponential common stock to remain artificially inflated.

157.   On June 28, 2023, the Company issued a press release denying statements contained in the Fuzzy Panda Report (the "June 28, 2023 Press Release"). The June 28, 2023 Press Release stated, in relevant part:

[Xponential] today issued the following statement in response to misleading information in a short-seller report published on June 26, 2023 (the "Report"):

"Together, the Board of Directors and Management of Xponential denounce the misleading Report, which contains inaccurate information, and caution investors not to rely on it.  The Board and Management stand firmly behind the strength of the business and health of its franchisees.  As the largest global franchisor of boutique fitness brands, we take great pride in our talented team and strong financial results, illustrated by solid and growing average unit volumes and same store sales.  Xponential's scalable business model, strong free cash flow generation and history of margin expansion position the Company for continued success."

Mark Grabowski, Chairman of the Board of Xponential and founder of Snapdragon Capital Partners, the Company's largest

1    investor, stated: "As an investor in high-performing businesses and

2    high-integrity management teams, I've known and worked closely with

3    Anthony Geisler, CEO of Xponential, since investing in Club Pilates at

4    my prior firm.  I couldn't speak more highly of his passion,

5    commitment to excellence and professionalism.  I am confident in the

6    strength of Xponential's business and the Company's continued

7    execution and creation of long-term shareholder value."

8    158.    Through an interview published in *Health Club Magazine* in November

9    2023, Defendant Geisler further refuted the Fuzzy Panda Report.  In response to a

10   question about whether the Fuzzy Panda Report had any lasting impact on Xponential,

11   Geisler responded in part, "[a]s a listed public company, we work closely with our

12   auditing partner Deloitte and Touche and our inside and outside legal advisors every

13   day.  There's no way to manipulate our numbers.  They are real and our results speak

14   for themselves."

15   159.    The above statements identified in ¶¶ 157-58 were materially false and

16   misleading and failed to disclose material adverse facts about the Company's

17   business, operations, and prospects.  Specifically, the Individual Defendants failed to

18   disclose to investors, *inter alia*, that: (i) the Company was manipulating their financial

19   metrics by excluding underperforming stores from reported SSS and AUV

20   calculations; (ii) the Company had permanently closed at least 30 stores; (iii) 8 out of

21   10 Xponential brands were losing money monthly; (iv) at least 50% of Xponential

22   studios never make a positive financial return; (v) over 100 franchises were for re-sale

23   at about a 75% discount to initial cost; (vi) as a result, many of the Company's

24   franchisees were in substantial debt, experienced high attrition rates, and operated

25   non-viable studios that had no practical path to profitability; (vii) the Company lacked

26   internal controls; and (viii) as a result of the foregoing, the Individual Defendants'

27

28

positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

160.   Following the Fuzzy Panda Report, in the third quarter of 2023, the Company began off-loading the failed studios it had taken back from franchisees during the Relevant Period to hide their true financial condition.  Because of the distressed financial condition of those studios, the Company took $13.8 million in charges to earnings and disclosed that it expected to take additional charges of up to $27 million in 2024.  Then, on February 15, 2024, Xponential announced that it had divested the entire Stride franchise for no consideration.

161.  On November 1, 2023, BofA Securities (the Company's lead underwriter) downgraded its rating on Xponential from "Buy" to "Neutral and slashed its price target from $35 to $16 after conducting its own investigation on the Company."  According to BofA Securities, the report was "[b]ased on our analysis of franchise disclosure documents and recent channel checks," estimated that "many franchisees across Pure Barre, Row House, AKT, and Stride that required financing may not be profitable," and stated that it anticipated "a deceleration in net unit growth . . . as less profitable units close."  The report also contained an extensive analysis of each brand, estimating a "Payback Period" as high as 26 years, even for profitable brands.

162.   On this news, the Company's stock price dropped 8% to close at $13.11 per share on November 1, 2023.

163.  On December 7, 2023, *Bloomberg Businessweek* published an investigative report titled "How the Biggest Boutique Fitness Company Turned Suburban Moms Into Bankrupt Franchisees," describing Xponential's controversial business practices (the "Bloomberg Report").[2]  The Bloomberg Report describes that

---

[2] Plaintiff incorporates by reference the Bloomberg Report.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

under Geisler's leadership, Xponential grew to roughly 3,000 locations by aggressively selling franchises to aspiring business owners, many of them former corporate workers and fitness enthusiasts looking to be their own bosses.

164. However, numerous franchisees report that the reality of ownership proved far different from what was promised. Many found themselves facing costs hundreds of thousands of dollars above what Xponential had quoted, while generating far less revenue than projected. When they struggled, franchisees say the Company offered little support and instead pressured them to invest more money or buy additional locations. Those trying to exit their franchises often faced steep fees or threats of litigation.

165. As a result, multiple franchisees have declared bankruptcy, lost their homes, or suffered mental health crises. Yet Xponential has worked to keep these failures hidden, using non-disclosure agreements and aggressive legal tactics to silence criticism. Even as problems mounted, the Company continued its rapid expansion, going public in 2021 and reporting robust growth numbers to investors.

166. On December 11, 2023, the next trading day, the Company filed a Form 8-K with the SEC stating: "On December 5, 2023, Xponential . . . was contacted by the [SEC], requesting that the Company provide it with certain documents." In response to the Bloomberg Report and the Company's confirmation of the SEC request, Xponential's stock collapsed another 33.8% over three trading days on heavy trading volume, to close at less than $9 per share on December 11, 2023.

**INVESTORS LEARN THE TRUTH**

167. On May 10, 2024, Xponential made a dramatic announcement that "[t]he Board has removed Anthony Geisler from his duties and suspended him indefinitely as CEO, also effective immediately." Press Release, Xponential Fitness, Inc., *Xponential Fitness Appoints Brenda Morris as Interim CEO*. Even though the Company did not explicitly connect Geisler's removal to any misconduct, Xponential

noted that "[t]he Company received notice on May 7, 2024 of an investigation by the United States Attorney's Office for the Central District of California" and mentioned a previous SEC investigation.

168.   Additional information was revealed on May 24, 2024, when Xponential filed a lawsuit against Geisler revealing that "[o]n December 5, 2023, the [SEC] issued a subpoena to Xponential requiring production of documents and communications related to studio closures, communications with franchise owners, financial reporting, and insider trading policies."  The lawsuit also disclosed that "[o]n May 7, 2024, the United States Attorney's Office for the Central District of California issued a grand jury subpoena to the Company in connection with the FBI's criminal investigation."

169.   These revelations caused Xponential's stock to drop by 31%.

### THE INSIDER TRADING DEFENDANTS SELL COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

170.   During the Relevant Period, Xponential insiders sold Company stock at artificially inflated prices while in possession of material non-public Company information.

171.   The Insider Trading Defendants sold Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein and while they were in possession of material non-public Company information:

- Between February 10, 2023, and March 6, 2024, Geisler sold 1,797,311 shares for proceeds of over $48 million.

- Between March 6, 2023, and March 6, 2024, Meloun sold 49,861 shares for proceeds of over $1 million.

- Between April 11, 2022 to November 21, 2024, Grabowski sold over 12.5 million shares for proceeds of almost $260 million.

172.   While many of the Company's stockholders lost significant money when the Company's shares dropped substantially upon the revelation of the fraud, the Insider Trading Defendants sold their shares at artificially high prices and avoided the staggering losses suffered by stockholders

173.   As a result, the Insider Trading Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of Xponential stock and stock options they held.

## XPONENTIAL REPURCHASES SHARES
## DURING THE RELEVANT PERIOD

174.   During the Relevant Period, the Individual Defendants caused the Company to repurchase its common stock at artificially inflated prices.  In total, the Company spent approximately $50 million to repurchase 2,598,877 shares at artificially inflated prices during the Relevant Period.  The actual value of the Company's stock was $9.44 per share as of closing on May 13, 2024, the next trading day after the truth was revealed; therefore, Xponential should have spent approximately $24.5 million to repurchase its stock during the Relevant Period.  As a result of the overpayment, Xponential suffered damages in the amount of approximately $25.5 million.

175.   The following chart details the Company's repurchase transactions during the Relevant Period:

| Repurchase Period | Number of Shares | Repurchase Price Per Share | Repurchase Amount | Actual Value of Repurchased Shares ($9.44) | Overpayment |
|---|---|---|---|---|---|
| Aug-23 | 2,010,050 | $ 19.90 | $ 39,999,995.00 | $ 18,974,872.00 | $ 21,025,123.00 |
| Oct-23 | 588,827 | $ 16.98 | $ 9,998,282.46 | $ 5,558,526.88 | $ 4,439,755.58 |
| **Total** | **2,598,877** | | **$ 49,998,277.46** | **$ 24,533,398.88** | **$ 25,464,878.58** |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

**INVESTORS FILE SECURITIES CLASS ACTIONS**

2    176.   On February 9, 2024, a purported purchaser of Company stock filed a

3    securities class action complaint, captioned *City of Taylor Gen. Employees Ret. Sys.*

4    *v. Xponential Fitness, Inc. et al.*, Case No. 8:24-cv-00285 in the United States District

5    Court for the Central District of California, Southern Division against Xponential and

6    Geisler and Meloun (the "City of Taylor Complaint").  The City of Taylor Complaint

7    alleges that throughout the class period of July 26, 2021, to December 7, 2023,

8    inclusive, the defendants made materially false and/or misleading statements, failing

9    to disclose material adverse facts about the Company's business, operations, and

10    prospects in violation of the Exchange Act.

11    177.   On June 18, 2024, a purported purchaser of Company stock filed a

12    securities class action complaint, captioned *City of West Palm Beach Police Pension*

13    *Fund v. Xponential Fitness, Inc. et al.*, Case No. 8:24-cv-01333 in the United States

14    District Court for the Central District of California, Southern Division against

15    Xponential and Geisler and Meloun (the "City of West Palm Beach Complaint").  The

16    City of West Palm Beach Complaint alleges that throughout the class period of April

17    6, 2022, to June 18, 2024, inclusive, the defendants made materially false and/or

18    misleading statements, failing to disclose material adverse facts about the Company's

19    business, operations, and prospects in violation of the Exchange Act.

20    178.   On May 21, 2024, the Hon. Judge John W. Holcomb consolidated the

21    City of Taylor and City of West Palm Beach Complaints under the caption, *In re*

22    *Xponential Fitness Securities Litigation*, Case No. 8:24-cv-00285-JWH-KESx.  On

23    July 26, 2024, lead plaintiffs in the consolidated action filed a consolidated complaint

24    that included Securities Act claims and therefore added Grabowski, Morris, and

25    Grayson as defendants, along with the Company's underwriters for the SPO.  The

26    parties in the Securities Class Action are briefing both a motion to supplement lead

27    plaintiffs' consolidated complaint and defendants' motion to dismiss.

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**THE INDIVIDUAL DEFENDANTS' MISCONDUCT
DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO XPONENTIAL**

179.   As a result of the Individual Defendants' improprieties, Xponential disseminated improper public statements concerning Xponential's operations, prospects, and internal controls.  This misconduct has devastated Xponential's credibility.

180.   As a direct and proximate result of the Individual Defendants' actions, Xponential has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action.

181.   In addition, Xponential will be required to expend funds to comply with both the SEC investigation and the Attorney General investigation, and may be subject to regulatory fines.

182.   As a direct and proximate result of the Individual Defendants' actions as alleged above, Xponential's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

183.   Lastly, the actions of the Individual Defendants have irreparably damaged Xponential's corporate image and goodwill.  For at least the foreseeable future, Xponential will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that Xponential's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

184.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts

as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

185.  The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

186.  The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

187. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

188.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and Xponential and was at all times acting within the course and scope of such agency.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

189.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

190.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' misconduct.

191.   Plaintiff is an owner of Xponential common stock and has been an owner of Xponential common stock since the wrongdoing alleged herein.

192.   Plaintiff has hired counsel experienced in conducting derivative litigation and will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

**A.    Demand Is Futile Because Each Member of the Board Faces a Substantial Likelihood of Personal Liability**

193.   At the time Plaintiff commenced this action, the Board consisted of seven members: Director Defendants Clarke, Grabowski, Grayson, and Morris and non-parties Bruce Haase, Mark King, and Jeffrey Lawrence.

194.   The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.  The Director Defendants all face a substantial likelihood of liability for their individual misconduct. The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning Xponential's business, operations, prospects, internal controls, and financial statements.

195.   Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

196.   The Director Defendants also approved the 2022 Proxy,[3] 2023 Proxy, and 2024 Proxy and, therefore, face a substantial likelihood of personal liability because of the false and misleading statements contained therein.

197.   The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, their failure to timely correct such statements, their failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and their failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

198.   If the Director Defendants were to bring a suit on behalf of Xponential to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  For this reason, Plaintiff's making a demand would be futile.

_____

[3] Excluding Clarke because he did not join the Board until July 2022.

**B.    The Audit Committee Defendants Face an Even Greater Likelihood of Personal Liability**

199.    The Audit Committee Defendants (Clarke, Grayson, Grabowski, and Morris), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements.  More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter.   For this reason, the Audit Committee Defendants cannot exercise disinterested business judgment in considering a demand.

**C.    Defendant Grabowski Lacks Independence**

200.    The 2022 Proxy, 2023 Proxy, and 2024 Proxy do not name Grabowski as an independent director.  In fact, Grabowski is a co-founder of the Company and has served as Chair of the Board since May 2017.  Moreover, Grabowski is a founder and Managing Partner at Snapdragon.  From August 2016 to June 2018, Grabowski was a partner at TPG Growth ("TPG"), where he oversaw the platform's consumer investments.

201.    In 2018, Grabowski left TPG to create Snapdragon.   Grabowski collaborated with Geisler to buy out TPG's stake in Xponential.  According to an article published by *Bloomberg* on December 12, 2017, Grabowski then reached out to Geisler to be the CEO of the Company.  Grabowski and Geisler have a longstanding personal and business relationship, thus, Defendant Grabowski cannot exercise independent business judgement to consider a demand that accuses Geisler of the wrongdoing as alleged herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

202.   Since the IPO, the Company has conducted two secondary public offerings, which allowed Grabowski to sell additional stock through Snapdragon, generating hefty proceeds for him.   Furthermore, between April 11, 2022 and November 21, 2024, Grabowski sold over 12.5 million shares of Company stock for proceeds of almost $260 million.   Thus, Grabowski is not disinterested nor independent to consider a demand.

**FIRST CAUSE OF ACTION**
**<u>Against the Individual Defendants for Breach of Fiduciary Duties</u>**

203.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

204.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Xponential's business and affairs.

205.   Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

206.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.   The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Xponential.

207.   In breach of their fiduciary duties owed to Xponential, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (i) the Company was manipulating their financial metrics by excluding underperforming stores from reported SSS and AUV calculations; (ii) the Company had permanently closed at least 30 stores; (iii) 8 out of 10 Xponential brands were

losing money monthly; (iv) at least 50% of Xponential studios never make a positive financial return; (v) over 100 franchises were for re-sale at about a 75% discount to initial cost; (vi) as a result, many of the Company's franchisees were in substantial debt, experienced high attrition rates, and operated non-viable studios that had no practical path to profitability; (vii) the Company lacked internal controls; and (viii) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

208.    Accordingly, Xponential's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

209.    The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

210.    The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties.

211.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

212.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls.   The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.   Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.   The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

213.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

214.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Xponential has sustained and continues to sustain significant damages.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**SECOND CAUSE OF ACTION**
**Against the Individual Defendants for**
**<u>Violations of Sections 20(a) of the Exchange Act</u>**

215.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

216.   Because of their positions of control and authority as officers and/or directors of Xponential, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of

1  Xponential, including the wrongful acts complained of herein within the meaning of

2  Section 20(a) of the Exchange Act.

3      217.  The Individual Defendants did the following while acting as controlling

4  persons:

5          (a)  employed devises, schemes, and artifices to defraud;

6          (b)  made untrue statements of material fact or omitted to state material

7               facts necessary in order to make the statements made, in light of

8               the circumstances under which they were made, not misleading; or

9          (c)  engaged in acts, practices, and a course of business that operated

10              as a fraud or deceit upon the Company in connection with its

11              purchases of Xponential common stock during the Relevant

12              Period.

13     218.  As set forth above, the Individual Defendants disseminated or approved

14 the dissemination of materially false and misleading statements while also failing to

15 disclose material facts necessary to make the statements made not misleading under

16 the circumstances.

17     219.  The Individual Defendants knew or recklessly disregarded facts showing

18 that these statements were false and misleading because they received or had access

19 to such information.

20     220.  As a result of the Individual Defendants' making these materially false

21 and misleading statements or permitting them to be made, Xponential's common stock

22 traded at artificially inflated prices during the Relevant Period.

23     221.  As discussed above, the Company spent approximately $50 million

24 purchasing 2,598,877 shares of Xponential common stock at artificially inflated prices

25 during the Relevant Period when it should have spent around $24.5 million for that

26 number of shares.

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

222. Accordingly, the Company has suffered damages because it paid artificially inflated prices for Xponential common stock.

### THIRD CAUSE OF ACTION
### Against the Exchange Act Defendants for Contribution under
### Sections 10(b) of the Exchange Act and SEC Rule 10b-5

223. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

224. Xponential, along with the Exchange Act Defendants (Geisler, Grabowski, and Meloun), are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) of the Exchange Act and SEC Rule 10b-5. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Exchange Act Defendants' willful and/or reckless violations of their obligations as officers and/or directors of Xponential.

225. Because of their positions of control and authority as officers and/or directors of Xponential, the Exchange Act Defendants were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Xponential, including the wrongful acts complained of herein and in the Securities Class Action.

226. Accordingly, the Exchange Act Defendants are liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, which create an implied private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

227. As such, Xponential is entitled to receive all appropriate contribution or indemnification from the Exchange Act Defendants.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

2

3

### FOURTH CAUSE OF ACTION
### Against the Securities Act Defendants for
### Contribution and Indemnification Under Section 11(f) of the Securities Act

4      228.   Plaintiff incorporates by reference and realleges each and every

5   allegation set forth above, as though fully set forth herein.

6      229.   As a named defendant in the Securities Class Action, Xponential is a joint

7   tortfeasor in claims brought under Section 11 of the Securities Act on behalf of its

8   stockholders.  However, Section 11(f) of the Securities Act provides Xponential with

9   a cause of action against other alleged tortfeasors in the Securities Class Action.

10     230.   The Securities Class Action alleges that the Secondary Offering

11  Documents contained untrue statements of material facts and omitted to state other

12  facts necessary to make the statements therein made not misleading in accordance

13  with the rules and regulations governing proper preparation of a registration statement.

14  Xponential is the registrant for the SPO, and the Securities Act Defendants (Geisler,

15  Grabowski, Grayson, Meloun, and Morris) were responsible for the contents and

16  dissemination of the Secondary Offering Documents.

17     231.   The Securities Class Action also alleges that none of the defendants

18  named therein made a reasonable investigation or possessed reasonable grounds for

19  the belief that the statements contained in the Secondary Offering Documents were

20  true and without omissions of any material facts and were not misleading.

21     232.   As an issuer of the shares, Xponential is strictly liable to the plaintiffs in

22  the Securities Class Action for the misstatements and omissions alleged in the

23  Securities Class Action.

24     233.   Because of their positions of control and authority as officers and/or

25  directors of Xponential, the Securities Act Defendants were able to and did, directly

26  and/or indirectly, exercise control over the business and corporate affairs of

27

28

Xponential, including the wrongful acts complained of herein in the Securities Class Action.

234. Therefore, to the extent the Company is found liable for violations of Section 11 of the Securities Act, the Securities Act Defendants are liable to the Company pursuant to Section 11(f) for all appropriate contribution and/or indemnification.

**FIFTH CAUSE OF ACTION**
**Against the Individual Defendants for**
**Violations of § 14(a) of the Exchange Act and SEC Rule 14a-9**

235. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

236. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

237. The 2022 Proxy, 2023 Proxy, and 2024 Proxy violated Section 14(a) and Rule 14a-9 because they solicited Xponential stockholder votes for, *inter alia*, director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's actual business, operations, and prospects.

238. The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9. By virtue of their positions within the Company and roles in the process and in the preparation of the 2022 Proxy, 2023 Proxy, and 2024 Proxy, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2022 Proxy, 2023 Proxy, and 2024 Proxy.

239.   The Individual Defendants knew that the statements contained in the 2022 Proxy, 2023 Proxy, and 2024 Proxy were materially false and misleading.

240.   The omissions and false and misleading statements in the 2022 Proxy, 2023 Proxy, and 2024 Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the re-election of directors. Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2022 Proxy, 2023 Proxy, and 2024 Proxy and in other information reasonably available to stockholders.

241.   As a direct and proximate result of the dissemination of the false and misleading 2022 Proxy, 2023 Proxy, and 2024 Proxy that the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, nominal defendant Xponential suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
### Against the Individual Defendants for Unjust Enrichment

242.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

243.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Xponential.

244.   The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from Xponential that was tied to the performance or artificially inflated valuation of

Xponential, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

245.   Plaintiff, as a stockholder and representative of Xponential, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

246.   Plaintiff, on behalf of Xponential, has no adequate remedy at law.

## SEVENTH CAUSE OF ACTION
### Against the Individual Defendants for Aiding and Abetting

247.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

248.   Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Xponential and has participated in a conspiracy in breach of fiduciary duties.

249.   In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct.  The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

250.   The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Company and its stockholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

251. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

252. Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

253. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

**EIGHTH CAUSE OF ACTION**
**Against the Insider Trading Defendants for**
**Insider Selling and Misappropriation of Information**

254. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

255. At the time of their stock sales set forth herein, the Insider Trading Defendants (Geisler, Grabowski, and Meloun) knew of the information described above and sold Xponential common stock on the basis of such information.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

256.    The information described above was proprietary non-public information concerning the Company.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold Xponential common stock.

257.    The Insider Trading Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

258.    Because the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Trading Defendants obtained thereby.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Xponential and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.    Ordering the Insider Trading Defendants to disgorge monies obtained as a result of their sale of Xponential stock while in possession of insider information as described herein;

D.    Awarding prejudgment interest to the Company;

E.    Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

77

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  February 10, 2025                    Respectfully submitted,

                                            **BRAGAR EAGEL & SQUIRE, P.C.**


*/s/ Melissa A. Fortunato*

Melissa A. Fortunato (SBN 319767)
  fortunato@bespc.com
Marion Passmore (SBN 228474)
  passmore@bespc.com
BRAGAR EAGEL & SQUIRE, P.C.
515 S. Flower Street, Suite 1800
Los Angeles, California 90071
Telephone: (213) 612-7735
Facsimile: (212) 214-0506

*Attorneys for Plaintiff*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT